**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NS8 INC.,[1]<br><br>  Debtor. | Chapter 11<br><br>Case No.: 20-12702 (CSS) |

**DECLARATION OF DANIEL P. WIKEL,**
**CHIEF RESTRUCTURING OFFICER OF NS8 INC., IN SUPPORT OF**
**<u>CHAPTER 11 PETITION AND FIRST DAY MOTIONS</u>**

I, DANIEL P. WIKEL, declare under penalty of perjury:

1.   I am a Senior Managing Director of FTI Consulting, Inc., ("<u>FTI</u>"), a firm providing special situation, turnaround, and restructuring services. I have over 25 years of experience working exclusively in distressed situations and transactions. My expertise includes in and out-of-court restructurings, operational turnarounds, asset sales, and refinancing transactions.

2.   FTI is a global leader in assisting companies across numerous industries in connection with out-of-court restructurings and bankruptcy proceedings. FTI specializes in debtor advisory services, bankruptcy case management and emergency, bankruptcy litigation consulting, interim management services, and creditor advisory services. FTI's debtor advisory services include a wide range of activities targeted at stabilizing and improving a company's financial position, including, among other things: (a) developing or validating business plans and related assessments of a business's strategic position; (b) monitoring and managing cash, cash flow, and supplier relationships; (c) assessing and recommending cost reduction strategies; (d) creating financial analyses and reporting for companies embarking on, or currently operating under, the

---

[1] The Debtor and the last four digits of its federal taxpayer identification number is as follows: NS8 Inc. (6056). The notice address for the Debtor is NS8 Inc., PO Box 34120, Las Vegas, NV 89133.

protection of chapter 11 of the bankruptcy code; and (e) designing and negotiating financial restructuring and wind-down packages, including actions arising under chapter 5 of the bankruptcy code, avoidance and asset recovery actions.

3. On or about October 21, 2020, I was engaged by NS8 Inc. ("NS8" or the "Debtor") to serve as the Chief Restructuring Officer ("CRO") and have served in that capacity since that time. From approximately September 22, 2020 until my appointment as CRO, I served as a financial advisor to the Debtor. I am authorized to submit this *Declaration of Daniel P. Wikel, Chief Restructuring Officer of NS8 Inc., in Support of Chapter 11 Petition and First Day Motions* (this "Declaration") in support of the Debtor's chapter 11 petition and the first day pleadings described below.

4. I am familiar with the day-to-day operations and business and financial affairs of the Debtor. I have also reviewed the Debtor's First Day Motions and Proposed Orders (each as defined below) and am familiar with the facts alleged and the relief requested therein. The Debtor has determined, in consultation with its financial and legal advisors, to file this chapter 11 case (the "Case") to further pursue the marketing process implemented prepetition and consummate a structured and orderly sale of the Debtor (the "Sale"), and to prosecute various litigation, avoidance and asset recovery actions to maximize the value of its estate on behalf of its stakeholders.

5. I submit this Declaration (i) to provide an overview of the Debtor and the Case and (ii) in support of the Debtor's chapter 11 petition and "first day" motions (each, a "First Day Motion" and collectively, the "First Day Motions") and the relief requested in the proposed orders therein (each, a "Proposed Order" and collectively, the "Proposed Orders"), which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtor's ability to maximize the value of its estate.

6.      If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.  In my capacity with the Debtor, I have become familiar with the Debtor's day-to-day operations, business affairs, financial condition, and books and records. I or other members of the Debtor's management team participated in preparing each First Day Motion (including the exhibits and schedules attached thereto).  I have reviewed each First Day Motion and, to the best of my knowledge, believe the facts set forth therein are true and correct.

7.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my service as an officer of the Debtor, my discussions with members of the Debtor's management team and the Debtor's advisors, my review of the Debtor's books and records and other relevant documents and information concerning the Debtor's operations, financial affairs, including initial litigation and asset recovery plans, my review of information compiled and communicated to me by other employees of the Debtor and the Debtor's professional advisors on which I reasonably relied, and my opinions based upon my experience and knowledge.

8.      Prior to the commencement of this Case, I, among other things: (i) reviewed and discussed the Debtor's strategy regarding the development of a potential sale and, ultimately, implementation of the process described herein; (ii) assisted in the preparation of the documentation needed to implement the Sale contemplated during this Case; and (iii) consulted on a regular basis with the Debtor's other senior management, board members and outside advisors with respect to the foregoing.

## II.     The Debtor's Business

### A.     Background

9.     The Debtor is a cyberfraud prevention company that develops and sells electronic tools to help online vendors assess the fraud risks of customer transactions. The Debtor's Federal Tax Identification Number is 81-3586056. The Debtor has two wholly owned, non-operating foreign affiliates organized under the laws of the Netherlands, NS8 Holdings B.V. and NS8 B.V. (the "Foreign Affiliates"). The Debtor's business verticals include: (i) safeguarding online businesses against advertising fraud, transaction fraud, and poor site performance; (ii) protecting against threats; and (iii) offering better insight into real customers by utilizing behavioral analytics, real-time user scoring, and global monitoring. Available through easy-to-install plugins on multiple platforms, NS8's solutions empower merchants to quickly minimize risk, better automate fraud management and realize savings throughout the customer lifecycle.

10.     NS8 was co-founded in 2016 by Adam Rogas ("Rogas") and five (5) others with the guidance and assistance of Mach37, a Tysons, Virginia based start-up accelerator designed to facilitate the creation of the next generation of cyber product companies. At the outset, NS8 operated like many other prototypical technology start-ups, relying on the sweat equity of its co-founders and the seed investment of friends, family and a few angel investors.

11.     From its creation until September 1, 2020, Rogas served as the Debtor's Chief Executive Officer, Chief Financial Officer, and as a member of its board of directors. In these capacities, Rogas was primarily responsible for the company's financial reporting and fundraising activities discussed below.

### B. Prepetition Indebtedness and Equity Capitalization

12. Prior to the Petition Date, the Debtor did not incur any secured indebtedness. In the ordinary course of business, the Debtor incurred unsecured indebtedness to various suppliers, trade vendors, landlords, utility providers and services providers, among others. As of the date hereof (the "Petition Date"), the Debtor's estimated outstanding unsecured indebtedness is approximately $600,000, which includes claims held by investors. It is our intention that a final financing order in this Case will provide a mechanism for the satisfaction of all general allowed unsecured claims in full. In addition, numerous parties likely possess unliquidated claims against the Debtor arising from the various misrepresentations made by Rogas relating to the extent and nature of the Debtor's prepetition operations further discussed below.

13. Prior to the Petition Date, NS8's operations were financed primarily through the sale of convertible preferred stock. The Debtor's equity holders consist of prominent technology investors and various venture capital funds.

14. NS8 conducted at least four (4) securities offerings prior to the Petition Date. Throughout 2016 and 2017, NS8 raised approximately $9.0 million from investors (the "Seed Rounds"). In early 2019, NS8 raised approximately $11 million from investors through the sale of convertible notes (the "Convertible Notes") and certain investors / institutions also exchanged holdings between one another. In late 2019 and the first half of 2020, NS8 raised over approximately $123 million from investors through the sale of preferred stock (the "Series A Round").

### III. Circumstances Giving Rise to The Case

15. As noted above, the Debtor has historically been dependent on its ability to raise additional capital to develop its technology, expand its workforce, and maintain operations. As a

result of the funding secured through its Seed Round, Convertible Notes and part of its Series A Round, by November 2019, NS8 had grown to include more than 54 employees and 6 office locations, including its corporate headquarters in Las Vegas, Nevada. Accordingly, and nominally to fund continued growth of its workforce, NS8 turned to the venture capital investment market again in late 2019 and throughout 2020 to raise the rest of its Series A Round. As of May 30, 2020, NS8 had grown to employ approximately 215 employees at office locations in Las Vegas, San Francisco, San Ramon, Miami, Amsterdam, Singapore, and Melbourne.

16. By June 2020, NS8 had obtained approximately $123 million in investor funds in the aggregate in connection with its Series A Round. Of these funds, approximately $72 million were utilized to capitalize a tender offer in which early stage investors were provided the opportunity to redeem their equity interests in the Debtor. Rogas received $17.5 million in proceeds from that tender offer, personally and through a company he controlled. The remaining funds were purportedly set aside for working capital purposes.

17. Unfortunately, it appears that the Series A Round was obtained by Rogas through deception and fraud. It is now clear that throughout NS8's history, Rogas had intentionally and grossly overstated its revenue, gross margin, and the extent and profitability of NS8's operations to current and prospective investors, the other members of the senior management team, the board of directors, and corporate partners.

18. In August 2020, the Debtor's newly-appointed President and Controller embarked on a process to rationalize and improve NS8's internal controls and financial reporting mechanisms. Despite outwardly welcoming the endeavor, Rogas delayed the effort to complete reporting for July 2020 and cede his customary control over the Debtor's bank accounts. Ultimately, the reasoning behind Rogas's reticence became apparent – while Rogas had

represented to NS8's finance team that the company possessed over $60 million in cash on hand, in fact, NS8 was on the precipice of a severe liquidity crisis. Rather than attempt to explain the discrepancy, Rogas abruptly resigned from NS8 on September 1, 2020. NS8's operations were thrown into turmoil.

19. The magnitude of Rogas's alleged wrongdoing is outlined in a complaint filed against Rogas by the Securities and Exchange Commission in the United States District Court for the Southern District of New York on September 14, 2020 (the "Complaint"). The SEC alleges in the Complaint that Rogas maintained control over the bank account into which NS8 received revenue from its customers, and periodically provided monthly statements from that account to NS8's finance department so that NS8's financial statements could be created. The Complaint notes that Rogas also maintained control over spreadsheets that purportedly tracked customer revenue, which were also used to generate NS8's financial statements.

20. The SEC further alleges in the Complaint that Rogas altered the bank statements before providing them to NS8's finance department to show tens of millions of dollars in both customer revenue and bank balances that did not exist. According to the Complaint, in the period from January 2019 through February 2020, for example, between at least approximately 40% and 95% of the purported total assets on NS8's balance sheet were fictitious. During that same period, the SEC alleges in the Complaint that bank statements that Rogas altered reflected over $40 million in fictitious revenue and that during the fundraising process, Rogas provided the falsified bank records he had created to auditors who were conducting due diligence on behalf of potential investors. On September 17, 2020, Rogas was arrested and charged with one count of securities fraud, one count of fraud in the offer or sale of securities, and one count of wire fraud. While the charges against Rogas remain pending at this time, I am informed that absent dismissal, they could

7

result in a lengthy prison term.

21.     In the immediate aftermath of these shocking revelations, and while assisting governmental authorities with all aspects of their investigation, the Debtor's management and Board of Directors sought to address the Debtor's looming liquidity crisis. NS8 shifted quickly away from its growth strategy into an aggressive cash preservation mode and began evaluating an orderly wind-down. NS8 retained restructuring counsel, Cooley LLP ("Cooley"), and FTI (who also began providing the Debtor with forensic accounting services) and began evaluating the short-term financial condition of the business, the state of cash flows, and the viability of various strategic alternatives. The Debtor determined that it could not continue operating as a going concern in the ordinary course, and in order to conserve liquidity, a major reduction in NS8's workforce was implemented in mid to late September 2020. The Debtor's employee headcount has been reduced to six (6) as of the Petition Date. In connection with these aggressive efforts to preserve liquidity and in connection with its workforce reduction, the Debtor has also vacated all of its various office locations as of the Petition Date.

22.     Contemporaneously with these efforts, FTI and members of the Debtor's Board of Directors sought to maximize the value of the Debtor's assets through a marketing process targeted at potential strategic acquirers. Under my direction, approximately 20 entities have been contacted, many of whom received due diligence information (including demonstrations of the utility of NS8's technology) and management presentations. Although no formal offers have been received, multiple parties have expressed interest in consummating a Sale, albeit not for much value. I am optimistic that at least a portion of the Debtor's assets along with some employees can remain operative as part of a going concern.

23.     As such, the Debtor, in consultation with its advisors, determined that the

immediate commencement of the Case was the best path forward, and that the pursuit of a Sale of the Debtor's assets, development of its litigation and asset recovery plan, and simultaneous expeditious investigation and prosecution of claims against Rogas and others would deliver maximum recoveries to NS8's stakeholders. With the assistance of FTI and Cooley, under the guidance of the board, NS8 sought and procured a debtor-in-possession financing facility to bolster its liquidity and enhance the estate's ability to accomplish these essential tasks. In connection with this process, I understand that the Debtor's non-operating Foreign Affiliates are engaged in a parallel dissolution process in the Netherlands.

## IV.    Summary of First Day Motions

24.    To minimize the adverse effects of the commencement of this Case, the Debtor has requested a variety of relief in the First Day Motions filed concurrently herewith. I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information and belief, the facts set forth therein are true and correct. I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

25.    Certain of the First Day Motions seek to pay discrete prepetition claims or to continue selected prepetition programs. This relief is essential to the Debtor's continued operation as a partial going concern and necessary to avoid immediate and irreparable harm to the Debtor and its remaining employees, customers, vendors, creditors, equity holders, and other stakeholders. The Debtor has an immediate need to continue the orderly operation and wind-down of its business, to obtain services and pay employees in the ordinary course of business. The Debtor's continued operations will enable it to preserve value under these difficult circumstances. A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

**A.    Debtor's Motion for Interim and Final Orders Authorizing (I) Payment of Wages, Compensation, and Employee Benefits, and (II) Financial Institutions to Honor and Process Checks and Transfer Related to Such Obligations (the "Wages Motion")**

26.     Pursuant to the Wages Motion, the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to (a) pay, in its sole discretion, the Employee Obligations (as defined below), as well as costs incident to the foregoing, and (b) maintain and continue to honor payments with respect to the Employee Benefits (as defined below), (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing; and (iii) granting related relief.

27.     As of the Petition Date, the Debtor employs six (6) individuals on a full-time basis (the "Employees").  The Debtor's Employees perform a wide variety of functions, all of which are mission-critical to the preservation of value and the administration of the Debtor's estate.  The Debtor's Employees are intimately familiar with the Debtor's business, processes, technology, and inventions, and cannot be easily replaced.  Without the continued, uninterrupted services of the Employees, the administration of the estate would be impaired and may impact the cost efficiencies gained from each of their respective roles versus firing professionals to perform their roles.  These workers will be unfairly harmed if the Debtor is not permitted to continue paying their compensation during the Case (the "Employee Obligations").  Consequently, the Debtor respectfully submits that the relief requested herein is necessary and appropriate under the facts and circumstances of this Case.

28.     The Debtor is seeking authority to pay prepetition obligations on account of Employee Obligations in the amount of approximately $30,000, all of which approximately is expected to come due within the first five (5) days of this Case.  The Debtor also requests authority to pay any additional prepetition costs associated with the Employee Obligations and the Debtor's

insurance and benefits programs (the "Employee Benefits") that may arise in accordance with the Debtor's budget.

29. I believe the Employees provide the Debtor with services necessary to conduct the Debtor's business and provide services based on their historical knowledge of their critical areas in NS8's technology suite, IT blueprint and capabilities, human resources and finance during the asset recovery process and wind-down, and, absent the payment of the Employee Obligations and Employee Benefits, the Debtor will likely experience Employee turnover and instability at this critical time. I believe that, without these payments, the Debtor's enterprise value may be impaired or impact the litigation and asset recoveries to the detriment of all stakeholders. I, therefore, believe that payment of the prepetition obligations with respect to the Employee Obligations and Employee Benefits is a necessary and critical element of the Debtor's efforts to preserve value. I believe that the relief requested in the Wages Motion, if granted, will benefit all parties in interest. Accordingly, I respectfully submit that the Court should approve the Wages Motion.

    **B.    Debtor's Motion (I) For Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtor to Pay Certain Prepetition Taxes and (II) Scheduling a Final Hearing (the "Taxes Motion")**

30. Pursuant to the Taxes Motion, the Debtor seeks an order authorizing, but not directing, the Debtor to remit and recover or pay certain sale, use, income, franchise and other taxes for which there may be personal liability for officers and directors (collectively, the "Prepetition Taxes").

31. In the ordinary course of its business, the Debtor incurs or collects and remits the Prepetition Taxes, which include, without limitation, certain sale, use, income and franchise taxes. The Debtor owes the Prepetition Taxes to various taxing authorities (collectively, the "Taxing Authorities"). In the ordinary course of its business, the Debtor incurs or collects and remits the

Prepetition Taxes, which include, without limitation, certain sale, use, income and franchise taxes. The Debtor owes the Prepetition Taxes to various taxing authorities (collectively, the "Taxing Authorities"). The Debtor is seeking authority to pay no more than $10,000 on an interim basis and $20,000 on a final basis on account of the Prepetition Taxes in the ordinary course of business, without regard to whether such obligations accrued or arose before or after the Petition Date.

32. The Debtor must continue to pay the Prepetition Taxes to avoid potential costly distractions during the Case. Specifically, the Debtor's failure to pay the Prepetition Taxes could adversely affect the Debtor's estate because the governmental authorities could file liens, impose enforceable penalties, interfere with the Debtor's licenses, or seek to lift the automatic stay. I believe that the relief requested in the Taxes Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to focus on pursuing a value maximizing transaction for the benefit of its estate. Accordingly, on behalf of the Debtor, I respectfully submit that the Taxes Motion should be approved.

   C. **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continuation of and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection With Various Insurance Policies, and (II) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto (the "Insurance Motion")**

33. Pursuant to the Insurance Motion, the Debtor seeks entry of an order (i) authorizing continuation of and payment of prepetition obligations incurred in the ordinary course of business in connection with various insurance policies, and (ii) authorizing banks to honor and process checks and electronic transfer requests related thereto. The Insurance Motion seeks authority to pay approximately $200,000 plus any associated fees on an interim and final basis with respect to the Debtor's Insurance Policies, specifically for an additional directors & officers policy to supplement the current policy. I understand that these anticipated costs are based on the Debtor's

historical premiums and related costs. The Insurance Policies include: (i) general liability, (ii) cyber liability, (iii) umbrella liability, (iv) workers' compensation and employers' liability, (v) employment practices liability, and (vi) directors & officers liability. Additional information regarding each policy is appended to the Insurance Motion.

34. The Debtor's Insurance Policies are essential to the uninterrupted and unaffected continuation of the business, properties and assets. I understand that the Debtor's various Insurance Policies are governed by different contracts, regulations and laws. As such, it is my understanding that if the Debtor does not make the necessary payments in connection with these Insurance Policies, it would have a potentially material impact on the Debtor's business.

35. I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest. Paying these Insurance Policies will avoid unnecessary disruption and harm to the Debtor as it remains focused on a sale of its intellectual property. Therefore, I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest. I respectfully request, on behalf of the Debtor, for the Insurance Motion to be approved as submitted to this Court.

    **D.**    **First Omnibus Motion of the Debtor For an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts Effective *Nunc Pro Tunc* To the Petition Date ("First Rejection Motion")**

36. Pursuant to the First Rejection Motion, the Debtor seeks to (i) reject the unexpired leases for the Debtor's former office locations (the "Leases") *nunc pro tunc* to the Petition Date; and (ii) abandon any personal property, if any, remaining on the premises (the "Premises") subject to each Lease.

37. Prior to the Petition Date, in connection with the Debtor's efforts to preserve

liquidity, the Debtor vacated its office locations after notifying the counterparties to the Leases of the Debtor's intent to vacate the underlying Premises. All Debtor personal property of any value or importance was removed from the Premises as of the Petition Date. Any Debtor personal property that remains on the Premises of each Executory Contract of Lease is, at most, of *de minimis* value to the Debtor's estate. Importantly, by rejecting the Leases, the Debtor estimates that it will save approximately $55,000 in monthly rents and related expenses.

38. The Debtor believes that rejecting the Leases and abandoning any personal property on the Premises will be in the best interests of the Debtor, its estate and its creditors. Accordingly, on behalf of the Debtor, I respectfully submit that the Bankruptcy Court should grant the First Rejection Motion.

**E.    Debtor's Application Seeking Entry of an Order (A) Authorizing and Approving the Appointment of Stretto as Claims and Noticing Agent for the Debtor Effective *Nunc Pro Tunc* to the Petition Date and (B) Granting Related Relief (the "Stretto Retention Application")**

39. Pursuant to the Stretto Retention Application, the Debtor is requesting entry of an order (a) appointing Stretto ("Stretto") as claims and noticing agent (the "Claims and Noticing Agent") for the Debtor in the Case effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Case, and (b) granting related relief.

40. The Debtor anticipates that there will be a significant number of persons and entities requiring notice in this Case. Thus, the Debtor submits that the appointment of a noticing agent will provide the most effective and efficient means of noticing and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Bankruptcy Court should approve the Stretto Retention Application.

**F.     Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Continued Use of Existing Bank Accounts, (C) Continued Use of Existing Business Forms, (D) Continued Use of the Corporate Credit Card Program, (E) Intercompany Transactions and Granting Of Administrative Expense Status For Postpetition Intercompany Claims, and (II) Granting Related Relief (the "<u>Cash Management Motion</u>")**

41.     Pursuant to the Cash Management Motion, the Debtor seeks authority to: (a) continue its existing cash management system, including the continued maintenance of its existing bank accounts, business forms and corporate credit card program, (b) continue to perform under and honor certain intercompany transactions in the ordinary course of business, and (c) provide administrative expense priority for postpetition intercompany claims.

42.     In the ordinary course of its business, the Debtor maintains a complex cash management system (the "<u>Cash Management System</u>") to manage its cash flow in an organized, cost-effective, and efficient manner.  The Debtor uses its Cash Management System to, among other things, transfer and distribute funds to various operating accounts and the Debtor's corporate credit card program to facilitate cash monitoring, forecasting, and reporting.

43.     Importantly, the Debtor's Cash Management System has been constructed to provide a substantially unified system for the Debtor and its affiliates, which allows for an integrated method of accounting for revenues and expenses to be collected and paid.  By centralizing control over the Cash Management System, the Debtor is able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information, and administer the various bank accounts required to effect the collection, disbursement and movement of cash (the "<u>Bank Accounts</u>").

44.     In addition to its Cash Management System, the Debtor maintains two (2) corporate

credit cards (the "Corporate Cards") issued by American Express and Silicon Valley Bank, respectively, pursuant to which the Debtor pays various operating expenses (the "Corporate Card Program"). The Corporate Cards are used by the Debtor's employees to pay obligations incurred in the ordinary course of business. Payments made on account of the Corporate Cards' balances are funded through the Cash Management System.

45. Further, the Debtor engaged in routine business transactions with its Foreign Affiliates (the "Intercompany Transactions") resulting in receivables and payables (the "Intercompany Claims"). As such, it has been the Debtor's practice to collect and move funds through various Bank Accounts to ensure the continued operation of the Debtor and the Foreign Affiliates. Accordingly, at any given time, there may be Intercompany Claims owed by the Debtor to the Foreign Affiliates.

46. The Debtor maintains records of Intercompany Transactions and can ascertain, trace, and account for the Intercompany Transactions. In exchange for payments to the Foreign Affiliates, the Debtor received certain valuable services and rights, with such transactions being governed by a comprehensive suite of services agreements, license agreements, contribution agreements, research and development agreements, and related intercompany agreements. In the trailing twelve months ended October 2020, NS8 transferred, in the form of advances and settlements, approximately €1.1 million to its non-Debtor foreign affiliates. Notwithstanding these past activities, the Foreign Affiliates are not operating entities as of the Petition Date, winding down their own operations upon parallel dissolution proceedings in the Netherlands.

47. Because of the nature of the Debtor's business and the significant disruption to the business that would result if affected, it is critical that the existing Cash Management System, Credit Card Program and its business forms remain in place, and that the Debtor be authorized to

continue to perform and honor its Intercompany Transactions. Accordingly, I respectfully submit that the Court should approve the relief set forth in the Cash Management Motion.

## **CONCLUSION**

48.   The Debtor's ultimate goal is to dispose of its assets in a value-maximizing transaction that preserves as much of its business as a going concern as possible while simultaneously pursuing litigation and asset recoveries against Rogas and other recipients of transfers of the Debtor's property to generate significant recoveries for the victims of Rogas's fraud and other stakeholders. I believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving these objectives will be substantially enhanced.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of October, 2020.

                                              Daniel P. Wikel
*Chief Restructuring Officer*
*Senior Managing Director, FTI Consulting, Inc.*